Stanley H. Shure, Esq. (SBN 116230)
    sshure@fortislaw.com
Peter E. Garrell, Esq. (SBN 155177)
    pgarrell@fortislaw.com
Salvatore Picariello, Esq. (SBN 190442)
    spicariello@fortislaw.com
Matthew A. Berliner, Esq. (SBN 224384)
    mberliner@fortislaw.com
FORTIS LLP
650 Town Center Dr., Ste. 1530
Costa Mesa, CA  92626
Telephone:    (714) 839-3800
Facsimile:     (714) 795-2995

Attorneys for Plaintiffs
RIALTO POCKETS, INC., ET AL.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| RIALTO POCKETS, INC.; BROOKHURST VENTURE, LLC; CITY OF INDUSTRY HOSPITALITY VENTURE, INC.; FARMDALE HOSPITALITY SERVICES, INC.; HIGH EXPECTATIONS HOSPITALITY, LLC; INLAND RESTAURANT VENTURE I, INC.; KENTUCKY HOSPITALITY VENTURE, LLC; K-KEL, INC.; L.C.M., LLC; MIDNIGHT SUN ENTERPRISES, INC.; NITELIFE, INC.; OLYMPIC AVENUE VENTURE, INC.; THE OXNARD HOSPITALITY SERVICES, INC.; PENN AVE HOSPITALITY, LLC; PLATINUM SJ ENTERPRISE; PNM ENTERPRISES, INC.; ROUGE GENTLEMEN'S CLUB, INC.; SANTA BARBARA HOSPITALITY SERVICES, INC.; SANTA MARIA RESTAURANT ENTERPRISES, INC.; SARIE'S LOUNGE, LLC; THE SPEARMINT RHINO ADULT SUPERSTORE, INC.; WORLD CLASS VENUES, LLC; WASHINGTON MANAGEMENT, LLC; AND W.P.B. HOSPITALITY, LLC, <br><br> Plaintiffs, | Case No. 2:20-cv-07709-DSF (JPRx) <br><br><br> **FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT** <br><br><br> **JURY TRIAL DEMANDED** |

1

v.

CERTAIN UNDERWRITERS AT
LLOYD'S, LONDON, INCLUDING
BEAZLEY FURLONGE LTD. for and on
behalf of LLOYD'S SYNDICATE 2623
AND BEAZLEY FURLONGE LTD. for
and on behalf of LLOYD'S SYNDICATE
0623,

Defendants.

        Plaintiffs Rialto Pockets, Inc.; Brookhurst Venture, LLC; City of Industry
Hospitality Venture, Inc.; Farmdale Hospitality Services, Inc.; High Expectations
Hospitality, LLC; Inland Restaurant Venture I, Inc.; Kentucky Hospitality Venture, LLC;
K-Kel, Inc.; L.C.M., LLC; Midnight Sun Enterprises, Inc.; Nitelife, Inc.; Olympic Avenue
Venture, Inc.; The Oxnard Hospitality Services, Inc.; Penn Ave Hospitality, LLC; Platinum
SJ Enterprise; PNM Enterprises, Inc.; Rouge Gentlemen's Club, Inc.; Santa Barbara
Hospitality Services, Inc.; Santa Maria Restaurant Enterprises, Inc.; Sarie's Lounge, LLC;
The Spearmint Rhino Adult Superstore, Inc.; World Class Venues, LLC; Washington
Management, LLC; and W.P.B. Hospitality, LLC (collectively, "Plaintiffs") by and
through their undersigned counsel, hereby sue Defendants Beazley Underwriting Limited,
Certain Underwriters at Lloyd's, London, including Beazley Furlonge Ltd. for and on
behalf of Lloyd's Syndicate 2623, and Beazley Furlonge Ltd. for and on behalf of Lloyd's
Syndicate 0623 (collectively, "Beazley"), and allege that Plaintiffs are entitled to relief
based upon the following allegations:

/ / /

/ / /

/ / /

2

**FIRST AMENDED COMPLAINT FOR DAMAGES**

## I.    NATURE OF THE ACTION

### A.    The Covid-19 Governmental Orders – Protecting The Public, Including the Plaintiffs' Employees, Patrons, And Those With Whom They Come Into Contact, From Becoming Infected With And/Or Transmitting Covid-19.

1.    The Covid-19 pandemic is an insidious disease that in many instances causes very serious injury, including death – over 170,000 in the United States alone as of the filing of this Complaint – to those who are exposed to the coronavirus. The transmission of the virus occurs from person to person, mainly through airborne respiratory droplets produced when an infected person breathes out, coughs, sneezes, or talks. Such droplets containing the virus can then land in the mouths or noses of people who are nearby and/or are inhaled into a person's lungs. Droplets containing the virus can also be spread by their landing on surfaces, which if someone comes in contact with, can ultimately enter (in many circumstances) into a person's respiratory system and infect them. The spread of Covid-19 is more likely when people are in close proximity to one another, *i.e.,* within about 6 feet. The transmission of the disease from person to person is especially difficult to stop because many persons who are infected with Covid-19 do not know they are infected since they are asymptomatic but nevertheless are "shedding" the virus. Such asymptomatic persons, when in a public setting, can easily spread the virus to others. The chances of transmitting Covid-19 are also greatly exacerbated by persons being in indoor settings.

2.    The Plaintiffs herein, in pertinent part, operate twenty-three (23) different gentlemen's clubs, of which fourteen (14) are located in California and one club is located in each of the following states: Nevada, Idaho, Kentucky, Minnesota, Pennsylvania, Texas, Florida and two (2) clubs in Iowa, as well as a retail store by the name of Spearmint Rhino Adult Superstore in California (collectively the "clubs"). The routine business operations of the clubs is essentially 365 days a year and business is conducted almost exclusively in indoor settings where employees are in close proximity not only with each other but with

3

1  the customers, who are also often in close proximity with other customers. The nature of
2  the clubs' business operations, like many other kinds of business operations such as those
3  occurring in restaurants and bars, presents a setting where Covid-19 can be easily
4  transmitted, infecting the clubs' employees and customers who, if infected, can then
5  transmit Covid-19 to others, including their own families and other persons with whom
6  they may come into contact.

7       3.      As part of the efforts to stop the spread of the Covid-19 pandemic and
8  thereby protect the health and safety of the public – including the clubs' employees, their
9  patrons, and others with whom their employees and patrons would come into contact –
10 orders were issued by state, county, and/or local governmental entities, depriving the
11 Plaintiffs of their ability to use the locations, *i.e.,* the real property out of which they
12 provide their business services ("Covid-19 Governmental Orders" or "Shut Down
13 Orders"). The Covid-19 Governmental Orders mandated, *i.e.*, required, that businesses,
14 such as the clubs operated by the Plaintiffs herein, stop conducting business. The Plaintiffs
15 have complied with the Covid-19 Governmental Orders, which have remained in effect
16 since mid-March 2020 for all the clubs other than those located in Carter Lake, Iowa,
17 Dallas, Texas, Minneapolis, Minnesota (limited capacity and limited operations schedule),
18 and the Spearmint Rhino Superstore in City of Industry, California (a retail store that was
19 closed from March 17, 2020 through June 7, 2020, and which reopened on a limited basis
20 on June 8, 2020). Because of the Covid-19 Governmental Orders, the Plaintiffs cannot
21 conduct their business operations, directly resulting in their sustaining millions of dollars
22 of losses.

23      4.      Plaintiffs based upon the plain meaning of the language used in the Policy
24 reasonably believed that the Policy – which includes "Time Element coverage" for loss
25 "directly resulting from direct physical loss or physical damage" to Property Insured –
26 provided coverage when a civil authority ordered a temporary shutdown of any of their

27
28

4

**FIRST AMENDED COMPLAINT FOR DAMAGES**

gentlemen's clubs for public health and safety reasons.

5. Plaintiffs have complied with all terms and conditions precedent contained in the Policy, to the extent not waived or otherwise excused, including providing timely notice of their loss. Plaintiffs are entitled to the full benefits and protections provided by the Policy.

### B. Beazley's Denial Of Coverage Is Based Upon Its Assertion That Only Physical Damage To Property Triggers Its Promise To Cover Direct Physical Loss Or Physical Damage To Property Insured.

6. Beazley Furlonge Ltd. underwrites insurance, handles claims, and conducts all of the insurance business affairs of the underwriting members of Lloyd's Syndicates 2623 and 623 ("Underwriters"). On behalf of Underwriters and with delegated authority granted by Beazley Furlonge, Ltd., Beazley Insurance Services issued to the Plaintiffs herein an "all risk" commercial property policy, Policy Number W25A95200201, for the Policy Period January 1, 2020 to January 1, 2021, which provides aggregate limits of liability of $10,000,000 per occurrence ("Beazley Policy" or "Policy"). Included within the Beazley Policy is its promise to pay its Insureds, the Plaintiffs herein, "Time Element loss," which includes the Insureds' recovery of their loss, to the extent the Insureds are:

(i) ***wholly or partially prevented*** from producing goods or ***continuing business operations or services***;

(ii) unable to make up lost production within a reasonable period of time, not limited to the period during which production is interrupted;

(iii) ***unable to continue such operations or services*** during the Period of Liability; and

**FIRST AMENDED COMPLAINT FOR DAMAGES**

(iv)   ***able to demonstrate a loss of sales for the operations, services or production prevented***. (***Emphasis*** added) (*See* Beazley Policy, attached hereto as Exhibit A, at pp. 32-33).[1]

7.      Plaintiffs sent notice to Beazley seeking coverage for the losses they had sustained as a direct result of the Covid-19 Governmental Orders that necessitated, *i.e.*, required, the closure of their business operations.

8.      Unfortunately, Beazley has refused to honor their promise to provide the protection that Plaintiffs purchased. Beazley, in its correspondence dated May 26, 2020, denied coverage under Time Element section of the Beazley Policy, asserting that coverage was not triggered because no "'direct physical loss or physical damage' to property has occurred at the insured's business premises." Beazley went on further to explain its denial by stating:

> "Again, there is no evidence or indication that any such property has suffered any physical loss or damage necessitating the closure of the insured's businesses. Their closure was ordered to prevent the spread of an infectious disease transmitted by human interaction, and ***not due to any physical damage to property***." (***Emphasis*** added).

9.      Beazley, per its explanation, asserts that the terms "physical loss" and "physical damage" are only triggered "due to any physical damage to property." Such an interpretation of "physical loss" and "physical damage" as being triggered only by physical damage to property renders the term "physical loss" illusory and without legal effect, a result that is contrary to one of the basic tenets of California's rules of contract interpretation requiring that all the words or phrases used in a contract are given separate and distinct meanings. (*See, e.g., Mirapad, LLC v. California Ins. Guarantee Assn.*, 132 Cal.App.4th 1058, 1070-73 (2005) (where policy referred to "person" and "organization" separately and distinctly, the words must be given their separate and distinct meaning to

_____

[1] Because the Beazley Policy contains several sets of page numbers, all references to page numbers will correspond to the PDF page number of this exhibit.

**FIRST AMENDED COMPLAINT FOR DAMAGES**

avoid creating ambiguity and redundancy); *Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal.App.4th 715, 754-55 (1993) (where a pollution exclusion contained the phrase "sudden and accidental," the terms "sudden" and "accidental" must have different meanings; thus, "accidental" conveys the sense of an unexpected and unintended event, while "sudden" conveys the sense of an unexpected event that is abrupt or immediate in nature); *Anthem Elecs., Inc. v. Pac. Emplrs. Ins. Co.*, 302 F.3d 1049, 1059-60 (9th Cir. 2002) ("sudden and accidental" exception to an "Impaired Property" exclusion required both sudden and accidental physical damage to circuit boards).

10.     It is also axiomatic under California law that the words and phrases found in a policy are given the plain everyday meaning a layperson would give them in context, with each word and provision giving meaning to each other. (Cal. Civ. Code § 1636; *ACL Technologies, Inc. v. Northbrook Property & Casualty Ins. Co.*, 17 Cal.App.4th 1773, 1792 (1993). There is no question that "physical damage" as used in the Beazley Policy refers to "damage," which refers to the alteration or change sustained by something that is "physical," *i.e.*, something having material existence, such as the real and personal property that constitute the Property Insured under the Beazley Policy.

11.     Giving the term "direct physical loss" the plain meaning a layperson would give this phrase in context results in the conclusion that the Plaintiffs herein, because of the Covid-19 Governmental Orders, sustained Time Element loss directly resulting from "direct physical loss." The word "direct" refers to something characterized by close logical, causal, or consequential relationship without interruption or deviation. (Webster's Third New Int'l Dictionary 640 (1981). Case law has interpreted "direct" as referring to proximate cause. (*American Tooling Center, Inc. v. Travelers Casualty & Surety Co. of Am.*, 895 F.3d 455, 460 (6th Cir. 2018) (citation omitted)). The word "physical" means something having material existence, such as the Property Insured, which includes the buildings that house the clubs' business operations. (*Blasiar, Inc. v.*

**FIRST AMENDED COMPLAINT FOR DAMAGES**

*Fireman's Fund Ins. Co.*, 76 Cal.App.4th 748, 754 (1999). The word "loss" as used in the phrase "physical loss" refers to ". . . losing possession; Deprivation." (Webster's Int'l Dictionary 1338 (2002). Deprivation, in turn, means "being kept from possessing, enjoying, or using something." (Merriam-Webster.com, last accessed August 17, 2020).

12.    A reasonable layperson giving the phrase "physical loss" its plain everyday meaning in context would interpret it as applying to losing or being deprived of the ability to use something that one possesses that has material existence, such as the buildings in which the gentlemen's clubs conduct their business operations. The Covid-19 Governmental Orders – without any intervening event or cause – necessitated the closure of the clubs' business operations, which occurred within the confines of the insured real property and meets the requirement that the "physical loss" is "direct." This is a reasonable interpretation of the terms "physical loss" that gives the phrase meaning separate and distinct from "physical damage" and is consistent with California's rules of contract interpretation. This interpretation therefore should be adopted. This is true even if Beazley is able to proffer another reasonable interpretation of "physical loss," as the existence of multiple reasonable interpretations, at least one of which would result in coverage existing, simply creates an ambiguity that will be construed against an insurer, such as Beazley here. (*Pardee Constr. Co. v. Ins. Co. of the West*, 77 Cal.App.4th 1340, 1352 (2000)). This is especially true where the language at issue, as is the case here, is present in an Insuring Agreement which under California law is, if any uncertainty in the language exists, construed broadly. (*HS Servs. v. Nationwide Mut. Ins. Co.*, 109 F.3d 642, 645 (9th Cir. 1997) (applying California law).

13.    Further supporting the reasonableness of Plaintiffs' interpretation are several decisions interpreting the term "direct physical loss" in the same way as the Plaintiffs herein. For example, in *Universal Sav. Bank v. Bankers Std. Ins. Co.*, 2004 WL 3016644, at *6 (Cal. Ct. App. Mar. 17, 2004), the California Court of Appeal held: "The

plain meaning of 'direct physical loss' encompasses physical displacement or loss of physical possession. That the loss must be 'physical' distinguishes the loss from some other, incorporeal loss. The ordinary meaning of 'direct physical loss' is not the same as that of 'direct physical damage,' as the use of the terms 'loss' and 'damage' in the context of the insuring clause does not suggest that the terms are synonymous."[2] (citing *Great Northern Ins. Co. v. Dayco Corp.*, 620 F. Supp. 346, 351 (S.D.N.Y. 1985)); *Total Intermodal Services, Inc. v. Travelers Property Casualty Co. of Am.*, 2018 WL 3829767, at *3 & n.4 (C.D. Cal. July 11, 2018) ("Under an 'ordinary and popular meaning,' the 'loss of' property contemplates that the property is misplaced and unrecoverable, without regard to whether it was damaged. Furthermore, to interpret 'physical loss of' as requiring 'damage to' would render meaningless the 'or damage to' portion of the same clause, thereby violating a black-letter cannon of contract interpretation – that every word be given a meaning. . . . The Court therefore rejects Travelers's proposed construction. Instead, the phrase 'loss of' includes [*i.e.*, its construction is non-limiting] the permanent dispossession of something.") (citations omitted); *Erik Scott Media, LLC v. Owners Ins. Co.*, 2018 WL 4146608, at *3 (D. Utah Aug. 30, 2018) ("The term 'direct physical loss' is not defined in the Policy. Nor is it stated that 'direct physical loss' requires destruction of or any physical impact altering the property itself. 'Direct physical loss' of the property is not clear or unmistakable. A plain reading of the term as used in the CPC provision could include the loss of physical possession or control of property that was not physically destroyed or altered in any way. The term 'loss' is susceptible to different interpretations and under Utah law must therefore be construed in favor of coverage.") (citation omitted).

14. While the type of property at issue in the cases cited in the preceding paragraph was not real property, the reasoning in these decisions applies with equal force

---

[2] Federal courts may consider unpublished California opinions as persuasive authority. *Emp'rs Ins. of Wausau v. Granite St. Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003).

**FIRST AMENDED COMPLAINT FOR DAMAGES**

1   to the property at issue here. The Beazley Policy's Time Element Coverage applies "to

2   Property Insured by this Policy." (*See* Beazley Policy, at p. 32). "Property Insured," in turn,

3   includes: "A. Real Property at an Insured Location, in which the Insured has an insurable

4   interest. B. Personal Property . . . ." (*Id*. at p. 22). There are no definitions, exclusions, or

5   other provisions in the Beazley Policy (and Beazley has not suggested any in its denial

6   letter) providing that the phrase "direct physical loss" in the Beazley Policy means

7   something different in the context of Real Property as opposed to Personal Property. Put

8   another way, it would be reasonable for a layperson to conclude that, under the Beazley

9   Policy, there is "direct physical loss" when the Insured loses the ability to possess, use, or

10  control all types of "Property Insured by this Policy," which in this instance are the

11  buildings out of which the clubs conduct their business operations.

12      **C.    The Covid-19 Governmental Orders is a Covered Cause Under the
13             "All Risk" Beazley Policy.**

14      15.    The Beazley Policy is an "all risk" policy that provides coverage for all risk

15  of "direct physical loss or physical damage" other than those that are expressly excluded by

16  the policy. (*State Farm Fire & Cas. Co. v. Von Der Lieth*, 54 Cal.3d 1123, 1131 (1991)).

17  Here, the Beazley Policy does not contain any exclusion that applies to government public

18  health and safety orders, such as the Covid-19 Governmental Orders at issue here. (*See,*

19  *e.g.*, Beazley Policy at pp. 18-21). Accordingly, the Covid-19 Governmental Orders

20  constitute a covered risk, *i.e.*, a covered peril under the Beazley Policy. Beazley, as

21  reflected from a review of the Policy knew how to exclude certain kinds of governmental

22  orders, such as those involving "seizure or destruction under quarantine or custom

23  regulation, or confiscation by order of any governmental or public authority," none of

24  which are at issue here. (*See id.*, General Exclusion A. 9. f. at 20).

25

26

27

28

**FIRST AMENDED COMPLAINT FOR DAMAGES**

16.     As reflected in Beazley's denial letter, Beazley does not assert that Covid-19 Governmental Orders are a non-covered, *i.e.*, an excluded, risk under the Beazley Policy. (*See* Beazley's Denial, at Exhibit B).

17.     Separately, Beazley also provides additional Time Element loss coverage under the Beazley Policy to its insureds in certain very limited circumstances – not at issue here – such as where the Property Insured itself has not sustained physical loss or physical damage. Such additional coverage is limited to circumstances where uninsured premises, within a certain physical distance from an insured location, sustain physical loss or physical damage and access to an insured location is prohibited. (*See* Beazley Policy, Time Element Section, at pp. 39-40).

### D.     Beazley's Reliance Upon the Mold Exclusion (Exclusion D) is Misplaced.

18.     Beazley also argued in its denial letter that, even if coverage were afforded under the Time Element provisions of its Policy coverage is barred because certain exclusions apply. In particular, Beazley argued that Plaintiffs' claim for coverage fell within the scope of its Mold Exclusion (Exclusion D), which excludes "any loss, damage, claim, cost, expense or other sum directly or indirectly arising out of or relating to: mold, mildew, fungus, spores or other microorganism of any type . . . ." (Beazley Policy, at p. 21). By its express terms, the exclusion specifically refers only to specific kinds of microorganisms, here "mold," "mildew," "fungus" or "spores."

19.     Beazley's reliance on the Mold Exclusion (Exclusion D) is misplaced.[3] Among other things, the items enumerated in the Mold Exclusion involve specific types of living things. (*See, e.g.*, Cambridge Dictionary (defining microorganism as "living thing that on its own is too small to be seen without a microscope")). The term "microorganism"

---

[3] Plaintiffs provide additional reasons below for why Beazley's reliance on Exclusion D, as well as other exclusions, is misplaced.

**FIRST AMENDED COMPLAINT FOR DAMAGES**

as used herein refers only to the same type of living organism of the same kind or type as mold, mildew, fungus or spores. By the exclusion's own terms, it would not apply to bacteria, which does not fit within the same general category as mold, mildew, fungus or spores. In any event, it is crystal clear that a virus, such as Covid-19, is not a living organism and does not fit within the scope of the exclusion. (*See* Dictionary.com, last accessed on August 17, 2020) ("Viruses are not technically considered living organisms because they are devoid of biological processes (such as metabolism and respiration) and cannot reproduce on their own but require a living cell (of a plant, animal, or bacterium) to make more viruses)."). Moreover, under the rule of *ejusdem generis*, Exclusion D's "catch-all" phrase of "including but not limited to" must be construed as having the same general nature as the enumerated types of "living" items. (Cal. Civ. Code § 3534; *Furtado v. Metropolitan Life Ins. Co.*, 60 Cal.App.3d 17, 25 (1976)). Further, since Plaintiffs' interpretation of the exclusion is a reasonable one, even if Beazley is able to proffer a different reasonable interpretation of the exclusion supporting its application, it simply creates an ambiguity that will be construed against Beazley. (*Pardee Constr. Co., supra,* 77 Cal.App.4th at 1352).

20.    Further, the Mold Exclusion is also uncertain and ambiguous to the extent it requires that an insured needs scientific expertise to interpret the exclusion. (*See, e.g.*, *Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.,* 45 Cal.App.4th 1, 36 (1996) ("A policy should not be read as it might be analyzed by an attorney or an insurance expert. This is so even if the policyholder is a sophisticated insured.") (citations omitted); *AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807 (1990) (unreasonable to conclude that phrase "legally obligated to pay" unambiguously incorporated sophisticated legal distinction; thus, the court resolved the ambiguity in favor of coverage). Additionally, where, as here, the language of the Mold Exclusion is uncertain or ambiguous under California law is to be interpreted narrowly.

**FIRST AMENDED COMPLAINT FOR DAMAGES**

21.     Further, under California law, certain aspects of the exclusion that provide, for example, that it applies "directly or indirectly arising out of or relating to" to the excluded risk are void and unenforceable under California law. (*Julian v. Hartford Underwriters Ins. Co.*, 35 Cal.4th 747, 754-55 (2005) (citing, *inter alia*, *Howell v. State Farm Fire & Casualty Co.*, 218 Cal.App.3d 1446, 1452 (1990); *Garvey v. State Farm Fire & Casualty Co.*, 48 Cal.3d 395, 399 (1989)).

22.     Finally, even if Plaintiffs' claim potentially falls within the enforceable portions of the Mold Exclusion and it is held to apply to the Covid-19 virus (and it does not), it is a factual question for a jury to determine whether the exclusion or the Covid-19 Governmental Orders, mandating the shutdown of Plaintiffs' Insured Locations are the "efficient proximate cause" (*i.e.*, the "predominating" or "most important cause") of Plaintiffs' Time Element losses. As such, Plaintiffs' losses are covered. (*Von Der Lieth*, *supra*, 54 Cal.3d at 1131-32 (observing that "the question of what caused the loss is generally a question of fact").

23.     Because Beazley has improperly denied Plaintiffs' claim, it has breached the insurance contract, and Plaintiffs are entitled to the damages of not less than $10 million per occurrence resulting from Beazley's breach, as well as prejudgment and post-judgment interest.

## II.   JURISDICTION AND VENUE

24.     This Court has jurisdiction over Plaintiffs' Complaint based on diversity of citizenship pursuant to 28 U.S.C. § 1332, as the amount in controversy, exclusive of interest and costs, exceeds the sum of Seventy Five Thousand Dollars ($75,000), and it involves (and involved at the time this action was commenced) a controversy between citizens of several states of the United States identified *infra* in Section III, on the one hand, and a citizen(s) of a foreign state (England), on the other.

**FIRST AMENDED COMPLAINT FOR DAMAGES**

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district. In addition, the contract of insurance, which is the subject of this Complaint, was entered into in Norco, California, which is located in the County of Riverside and, as such, the Eastern Division of this Court. Moreover, this Court has personal jurisdiction over Defendants because, *inter alia*, they are authorized to do business and in fact do business in this judicial District and have sufficient minimum contacts with this Judicial District.

26.     In addition, Item 4 of the Policy's "Certificate Provisions" is entitled "**Service of Suit Clause.**" This clause provides, *inter alia*, that "[i]n the event of the failure of Underwriters to pay any amount claimed to be due under the insurance described herein, Underwriters have agreed that, at the request of the Assured, they will submit to the jurisdiction of a Court of competent jurisdiction within the United States." Item 4 further provides that, "[i]n any suit instituted against any one of them upon the insurance described herein, Underwriters have agreed to abide by the final decision of such Court or of any Appellate Court in the event of an appeal." In addition, the "Underwriters have further agreed that service of process in such suit may be made upon FLWA Service Corp, c/o Foley & Lardner LLP, 555 California Street, Suite 1700, San Francisco, CA." Moreover, in Item 14 of the Policy's "Certificate Provisions," which is entitled "**Conformity,**" the Policy provides, among other things, that "[i]t is hereby noted and agreed that wherever the words 'Underwriters,' 'Insurers,' 'Company' appear in this Certificate they shall be deemed to be synonymous."

## III.   THE PARTIES

27.     Plaintiff Rialto Pockets, Inc. is a California corporation having its principal place of business in the County of San Bernardino, California.

28.     Plaintiff Brookhurst Venture, LLC is a California limited liability company having its principal place of business in the County of Orange, California. Brookhurst

14

Venture LLC is comprised of a sole member: MVJ Entertainment, LLC, which is also a California limited liability company having its principal place of business in California. MVJ Entertainment, LLC, in turn, is comprised of a sole member: the MVJ 2011 Irrevocable Trust. The MVJ 2011 Irrevocable Trust is an irrevocable trust formed under the laws of the State of California on July 20, 2020. Kathy Vercher, who is the trustee of the MVJ 2011 Irrevocable Trust, is a citizen of the State of California.

29.     Plaintiff City of Industry Hospitality Venture, Inc. is a California corporation having its principal place of business in the County of Los Angeles, California.

30.     Plaintiff Farmdale Hospitality Services, Inc. is a California corporation having its principal place of business in the County of Los Angeles, California.

31.     Plaintiff High Expectations Hospitality, LLC is a Texas limited liability company having its principal place of business in the County of Dallas, Texas. High Expectations Hospitality, LLC is comprised of a sole member: Big Time Entertainment, LLC, a Texas limited liability company having its principal place of business in Texas. Big Time Entertainment, LLC, in turn, is comprised of a sole member: GK Worldwide Enterprises, LLC, which is a Texas limited liability company having its principal place of business in the State of Texas. GK Worldwide Enterprises, LLC, in turn, is comprised of two members: (1) JLG 2011 Trust, which is a revocable trust formed under the laws of the State of California, on July 20, 2011, and which has Kathy Vercher, serving as trustee of the JLG Trust, who is a citizen of the State of California; and (2) Brad Keiller, who is a citizen of the State of Texas.

32.     Plaintiff Inland Restaurant Venture I, Inc. is a California corporation having its principal place of business in the County of Los Angeles, California.

33.     Plaintiff Kentucky Hospitality Venture, LLC is a Delaware limited liability company having its principal place of business in the County of Fayette, Kentucky. Kentucky Hospitality Venture, LLC is comprised of a sole member: The Spearmint Rhino

15

Companies Worldwide, Inc., which is a Nevada corporation having its principal place of business in Norco, California.

34.     Plaintiff K-Kel, Inc. is a Nevada corporation having its principal place of business in the County of Clark, Nevada.

35.     Plaintiff L.C.M., LLC is an Idaho limited liability company having its principal place of business in the County of Ada, Idaho.  L.C.M., LLC is comprised of a sole member:  The Spearmint Rhino Companies Worldwide, Inc., which is a Nevada corporation having its principal place of business in Norco, California.

36.     Plaintiff Midnight Sun Enterprises, Inc. is a California corporation having its principal place of business in the County of Los Angeles, California.

37.     Plaintiff Nitelife, Inc. is a Minnesota corporation having its principal place of business in the County of Hennepin, Minnesota.

38.     Plaintiff Olympic Avenue Venture, Inc. is a California corporation having its principal place of business in the County of Los Angeles, California.

39.     Plaintiff The Oxnard Hospitality Services, Inc. is a California corporation having its principal place of business in the County of Ventura, California.

40.     Plaintiff Penn Ave Hospitality, LLC is a Delaware limited liability company having its principal place of business in the County of Allegheny, Pennsylvania. Penn Ave Hospitality, LLC is comprised of two members: (1) Worldwide Two, LLC, which is a Delaware limited liability company having its principal place of business in Delaware, which, in turn, is comprised of a sole member – the Gray Family 2017 Irrevocable Trust, which is an irrevocable trust formed under the laws of State of Nevada  on August 1, 2017, and which has First American Trust of Nevada LLC serving as the trustee of the Gray Family 2017 Irrevocable Trust, and which is a citizen of the State of Nevada which is a wholly-owned subsidiary of First American Financial Corporation, which is a Delaware corporation with a principal place of business in the County of Orange, California; and (2)

**FIRST AMENDED COMPLAINT FOR DAMAGES**

Pitt Ops, LLC, which is a Nevada limited liability company having its principal place of business in Michigan, which, in turn, is comprised of a sole member – the Ernie J D'Ascenzo Revocable Trust UAD March 11, 1998, which is a revocable trust formed under the laws of the State of Michigan, and which has Ernie D'Ascenzo serving as the trustee of the Ernie J D'Ascenzo Revocable Trust UAD March 11, 1998, who is a citizen of the State of Michigan.

41.     Plaintiff Platinum SJ Enterprise is a California corporation having its principal place of business in the County of Santa Clara, California.

42.     Plaintiff PNM Enterprises, Inc. is a California corporation having its principal place of business in the County of Orange, California.

43.     Plaintiff Rouge Gentlemen's Club, Inc. is a California corporation having its principal place of business in the County of Los Angeles, California.

44.     Plaintiff Santa Barbara Hospitality Services, Inc. is a California corporation having its principal place of business in the County of Santa Barbara, California.

45.     Plaintiff Santa Maria Restaurant Enterprises, Inc. is a California corporation having its principal place of business in the County of Santa Barbara, California.

46.     Plaintiff Sarie's Lounge, LLC is an Iowa limited liability company having its principal place of business in the County of Pottawattamie, Iowa. Sarie's Lounge, LLC is comprised solely of one member: SR Midwest I, LLC, which is a Delaware limited liability company having its principal place of business in Iowa, and which, in turn, is comprised of a sole member – MVJ Entertainment LLC, which is a Delaware limited liability company having a principal place of business in California, which, in turn, is comprised of a sole member – the MVJ 2011 Irrevocable Trust, which is an irrevocable trust formed under the laws of the State of California on July 20, 2011, and which has Kathy Vercher serving as trustee of the MVJ 2011 Irrevocable Trust, who is a citizen of the State of California.

17

**FIRST AMENDED COMPLAINT FOR DAMAGES**

47.     Plaintiff The Spearmint Rhino Adult Superstore, Inc. is a California corporation having its principal place of business in the County of Los Angeles, California.

48.     Plaintiff World Class Venues, LLC is an Iowa limited liability company having its principal place of business in the County of Pottawattamie, Iowa. World Class Venues, LLC is an Iowa limited liability company having its principal place of business in Iowa, which, in turn, is comprised solely of one member: SR Midwest I, LLC, which is a Delaware limited liability company having its principal place of business in Iowa, and which, in turn, is comprised solely of one member – MVJ Entertainment, LLC, which is a Delaware limited liability company having its principal place of business in California, which, in turn, is comprised of a sole member – the MVJ 2011 Irrevocable Trust, which is an irrevocable trust formed under the laws of the State of California on July 20, 2011, and which has Kathy Vercher serving as trustee, who is a citizen of the State of California.

49.     Plaintiff Washington Management, LLC is a California limited liability company having its principal place of business in the County of Los Angeles, California. Washington Management, LLC is comprised solely of one member which is DDL Los Angeles, LLC, which is a Nevada limited liability company having its principal place of business in California, and which, in turn, is comprised solely of one member which is USHG, LLC, which is a Delaware limited liability company having its principal place of business in California, and which, in turn, is comprised of two members – (a) the MVJ One, LLC which is California limited liability company having its principal place of business in the State of California, which, in turn, is comprised solely of one member: the MVJ 2011 Irrevocable Trust, which is an irrevocable trust formed under the laws of the State of California on July 20, 2011, and which has Kathy Vercher serving as trustee, who is a citizen of the State of California; and (b) the Jerry and Patricia Jamgotchian Revocable Living Trust, which is a revocable trust formed under the laws of the State of California on

18

**FIRST AMENDED COMPLAINT FOR DAMAGES**

April 22, 1999, and which has  Patricia Jamgotchian and Jerry Jamgotchian serving as co-trustees, who are both citizens of the State of California.

50.     Plaintiff W.P.B. Hospitality, LLC is a Florida limited liability company having its principal place of business in the County of Palm Beach, Florida. W.P.B. Hospitality, LLC is comprised of two members: 1) GK Worldwide Enterprises, LLC, which is a Delaware limited liability company having its principal place of business in California, which, in turn, is comprised of two members: (a) the JLG 2011 Trust, which is a revocable trust formed under the laws of the State of California, on July 20, 2011, and which has Kathy Vercher serving is the trustee of the JLG 2011 Trust, who is a citizen of the State of California; and (b) Brad Keiller, who is a citizen of the State of Texas and 2) WPB, LLC which is a California limited liability company having its principal place of business in California, which, in turn, is also comprised of two members: (a) the Weber Family Trust which is a revocable trust formed under the laws of the State of California on September 7, 2003, and which has Cathy Weber and Chuck Weber serving as co-trustees who are citizens of the State of California; and (b) Carol Geronsin who is a citizen of the State of California.

51.     Defendant Certain Underwriters at Lloyd's, London is comprised of a number of individuals and/or corporations that subscribed to an insurance policy – Commercial Property Policy No. W25A95190101 – issued to Plaintiffs. The particular Lloyd's syndicates that subscribed to Commercial Property Policy No. W25A95190101 are as follows:

     a.     Lloyd's Syndicate 2623, which, upon information and belief, is an unincorporated association organized under the laws of England and Wales, and which is managed by Beazley Furlonge Ltd., which, in turn, is wholly owned by Beazley PLC.

**FIRST AMENDED COMPLAINT FOR DAMAGES**

b.      Lloyd's Syndicate 623, which, upon information and belief, is organized under the laws of England and Wales, and which is managed by Beazley Furlonge Ltd., which, in turn, is wholly owned by Beazley PLC.

c.      Lloyd's participated in coverage for the Policy at issue via Syndicate 2623 (82%) and Syndicate 623 (18%).

d.      Lloyd's is authorized to write surplus lines insurance in the State of California, such as the Commercial Property Policy at issue. (Certain Underwriters and Beazley are collectively referred to herein as "Beazley.")

52.     Defendant Beazley Underwriting Limited is the sole member of Syndicate 2623. As such, Beazley Underwriting Limited is an insurer under the Policy. Beazley Underwriting Limited is an English corporation, formed and existing under the laws of England and Wales, with its principal place of business at Plantation Place South, 60 Great Tower Street, London, England EC3R 5AD.

53.     Pursuant to Item 4 of the Certificate, *see* Paragraph 26, *ante*, a suit brought against Beazley Underwriting Limited alone, is binding upon all insurers (underwriters), including those entities and/or persons – whose identities have yet to be determined – that make up the members (names) of Syndicate 623.

## IV.    NON-PARTIES

54.     The following two (2) entities are referenced as a matter of context, albeit they did not suffer a direct Time Element loss as the Plaintiffs suffered.

55.     Non-Party The Spearmint Rhino Companies Worldwide, Inc. ("Companies") is a Nevada corporation having its principal place of business in the County of Riverside, California. Companies is the holder of all intellectual property and licenses the use of said intellectual property including, but not limited to, names, logos, trade dress, design, floor and wall coverings, etc. to each of the Clubs operating under the Spearmint Rhino, Blue Zebra, Dames N' Games and California Girls brand names and is paid either a percentage

**FIRST AMENDED COMPLAINT FOR DAMAGES**

of gross revenues or a flat fee varied by location for such licenses. The Beazley Policy identifies Companies as the Named Insured and notes its address in Norco (Riverside County), California.

56.     Non-Party Spearmint Rhino Consulting Worldwide, Inc. ("SRCW") is a Delaware corporation having its principal place of business in the County of Riverside, California. SRCW is a consulting company that provides services including, but not limited to, zoning, licensing, human resources,  accounting, information technology, etc. to each of the Clubs operating under the Spearmint Rhino, Blue Zebra, Dames N' Games and California Girls brand names and is paid either a percentage of gross revenues or a flat fee varied by location for such services.

## V.     FACTUAL BACKGROUND

### A.     The Covid-19 Pandemic.

57.     Covid-19 is an infectious disease cause by a recently discovered coronavirus known as SARS-CoV-2 ("Coronavirus" or "Covid-19"). The first instances of the disease spreading to humans were diagnosed in or around December 2019.

58.     On January 21, 2020, the first American Covid-19 case was confirmed in the State of Washington. (*See* Centers for Disease Control and Prevention, https://www.cdc.gov/media/releases/2020/p0121-novel-coronavirus-travel-case.html (last accessed August 15, 2020).

59.     Shortly thereafter, by January 26, 2020, the United States Centers for Disease Control ("CDC") confirmed the first Covid-19 case in California. (See Cal. Dept. of Health, https://www.cdph.ca.gov/Programs/OPA/Pages/NR20-001.aspx (last accessed August 15, 2020)).

60.     On January 30, 2020, the World Health Organization ("WHO") declared that the Coronavirus outbreak constituted a public health emergency of international concern.

61.     On March 4, 2020, the first Covid-19 fatality was reported in California.

62.     On March 11, 2020 the WHO declared Coronavirus a worldwide pandemic.

63.     On March 13, 2020, President Trump declared the Covid-19 pandemic to be a national emergency.

64.     On March 16, 2020, the CDC and national Coronavirus Task Force issued guidance to the American public advising individuals to adopt social distancing measures.

65.     As of August 15, 2020, the number of confirmed cases of Covid-19 is over 21.2 million worldwide, with over 767,000 deaths. (*See* Johns Hopkins Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html (last accessed August 15, 2020)).

**B.    State and Local Governments Order Everyone to "Stay at home" and that Non-Essential Businesses, Such as the Clubs, Close.**

66.     On March 4, 2020, California Governor Gavin Newsom issued an order declaring "a State of Emergency to exist in California as a result of the threat of Covid-19." See State of California Executive Order N-25-20.

67.     On March 12, 2020, Governor Newsom issued a new Executive Order further enhancing state and local government's ability to respond to the Covid-19 pandemic, including the cancellation of large non-essential gatherings.

68.     On March 14, 2020, county public health offices issued an order cancelling gatherings of more than 100 people and restricting gatherings of more than 35 people.

69.     On March 15, 2020, Governor Newsom issued guidelines calling for "profoundly significant steps" to limit the spread of Covid-19. These guidelines required the self-isolation of all residents 65 years of age or older and the closure of all "[b]ars, nightclubs, wineries, brew pubs and the like." The guidelines further required all restaurants to halve their capacities and keep customers at least six feet from one another." (*See* Cowan, Jill, *California Governor Orders Radical Changes to Daily Life*, N.Y. Times (Mar. 16, 2020), https://www.nytimes.com/2020/03/16/us/california-newsom-bars-home-isolation.html (last accessed July 6, 2020)).

**FIRST AMENDED COMPLAINT FOR DAMAGES**

70.     On March 19, 2020, Governor Newsom issued statewide Executive Order N-33-20, which directed "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sector as outlined at https://www.cisa.gov/identifying-critical-infrastructure-during-Covid-19." Plaintiffs' gentlemen's clubs do not fall within any of the 16 critical infrastructure sectors.

71.     By its own terms, Executive Order N-33-20 was necessary to "preserve the public health and safety, and to ensure the healthcare delivery system is capable of serving all," as well as to "bend the curve, and disrupt the spread of the virus."

72.     County and local governments across California have entered their own orders mandating that resident's shelter in place and that businesses limit or cease operations. For example, on March 19, 2020, Los Angeles County and City (where 7 of Plaintiffs' 14 California nightclubs are located as well as the Spearmint Rhino Superstore) issued orders significantly restricting public mobility and business operations, including a prohibition of all indoor and outdoor gatherings of 10 or more people. (*See* Safer at Home Order, https://www.lamayor.org/COVID19Orders).

73.     Other states around the country have implemented similar orders, based upon the Covid-19 pandemic requiring businesses, including Plaintiffs' nightclubs, to close their doors.

74.     The above-referenced Covid-19 Governmental Orders are neither laws nor ordinances.

75.     Plaintiffs did not have the ability or right to ignore these Covid-19 Governmental Orders, and doing so would have exposed Plaintiffs, *inter alia*, to fines and sanctions.

76.     Eventually, on May 4, 2020, Governor Newsom issued Executive Order N-60-20 concerning the second and third stages of California's "four-stage framework . . . to

**FIRST AMENDED COMPLAINT FOR DAMAGES**

allow Californians to gradually resume various activities." Stage 2 allows gradual reopening of lower-risk workplaces with adaptations, including bookstores, clothing stores, florists, and sporting goods stores, with modifications. (*See* Office of Governor Newsom's Update on California's Progress Toward Stage 2 Reopening, May 4, 2020, https://www.gov.ca.gov/2020/05/04/governor-newsom-provides-update-on-californias-progress-toward-stage-2-reopening). The May 4th Executive Order – which also qualifies as a Covid-19 Governmental Order – states that, in Stage 3, California will allow the reopening of higher-risk businesses and spaces, but it does not identify the types of businesses that will fall within Stage 3.

77.     To date, the Spearmint Rhino Superstore which is a retail store located in City of Industry, California, was recently permitted to reopen on a limited basis. In contrast, Plaintiffs' clubs located in California and Nevada have not been allowed to reopen at any point since March 2020 to present.

78.     Some of Plaintiffs' clubs located outside of California and Nevada have reopened at least temporarily and sometimes only sporadically, depending upon regulatory authority. Specifically, the clubs in Carter Lake, Iowa, and Dallas, Texas are currently now open. The club in Minneapolis, Minnesota is also open, albeit with limited operating hours and subject to more strict limited capacity requirements. The club in Lexington, Kentucky opened briefly but was ordered soon thereafter once again to shut down. The club in Pittsburgh, Pennsylvania was open for a short duration during this pandemic period but has remained closed, and the club in West Palm Beach, Florida opened for approximately one day before closing.

**C.     Plaintiffs Are Forced to Close Their Operations, Directly Resulting in Time Element Financial Losses.**

79.     Between March 14, 2020 and March 19, 2020, all of Plaintiffs' 23 clubs throughout the country as well as the Spearmint Rhino Superstore were closed as a result

24

1 | of the Covid-19 Governmental Orders.

2 | 80. Plaintiffs have suffered and continue to suffer Time Element losses, as set

3 | forth in the Time Element Coverages, directly resulting from the Covid-19 Governmental

4 | Orders that require that they shut down their business operations.

5 | 81. More specifically, as measured by the Policy's provisions related to "Time

6 | Element loss" as set forth in the Time Element Coverages" located in Section D of the

7 | Policy, Plaintiffs' losses are in excess of $10 million as of the date of filing the instant

8 | Complaint, and their losses are continuing to grow.

9 | **VI. RELEVANT POLICY PROVISIONS**

10 |     **A. Beazley Issued an "All-Risk" Commercial Property Policy.**

11 | 82. The Policy issued to Plaintiffs by Beazley is an "all risk" commercial

12 | property policy, which covers loss or damage to the property insured resulting from "all

13 | risks" other than those expressly excluded. This Policy includes coverage for "Time

14 | Element loss," which promises to cover Plaintiffs for their "Time Element loss" as set forth

15 | in the "Time Element Coverage" (which include the financial losses they sustain because

16 | they cannot conduct their business operations) directly resulting from a direct physical loss

17 | to Property Insured under the Policy.

18 | 83. Beazley knew how to exclude certain risks in its Policy involving the

19 | issuance of government orders, but choose not to exclude government health and safety

20 | orders, such as the Covid-19 Governmental Orders. For example, in Section B of the

21 | Policy, Beazley included under General Exclusion A.9.f an exclusion that reads "seizure or

22 | destruction under quarantine or custom regulation, or *confiscation by order* of any

23 | governmental or public authority." (Emphasis added). Notably, however, Beazley did not

24 | include an exclusion for public health and safety orders.

25 | 84. Beazley, a large United Kingdom-based insurer, is also sophisticated enough

26 | to define "Computer Virus." (*See* Beazley Policy, Section B, APPLICATION OF THIS

27 |

28 |

**FIRST AMENDED COMPLAINT FOR DAMAGES**

1  POLICY TO ELECTRONIC DATA, at p. 17). Yet, Beazley never used (let alone defined)

2  the term "virus" in any of the exclusions contained in the Policy.

3        **B.**    **The Insurance Certificate.**

4      85.    The first portion of the Policy is the "Certificate of Beazley Insurance

5  Services" (hereinafter, the "Certificate").

6      86.    Among other things, the Certificate provides notice that the Policy has been

7  issued by "nonadmitted" or "surplus lines" insurers.

8      87.    The Certificate also includes a number of "Provisions," including Item 12,

9  entitled "**Law and Jurisdiction**." Item 12 is a choice-of-law provision that states: "This

10  Insurance shall be governed by the laws of California and subject to the exclusive

11  jurisdiction of the courts of USA per the Service of Suite Clause [i.e., Certificate, Item 4]

12  contained therein." Accordingly, California law applies to all of Plaintiffs' locations at

13  issue herein, even those that are operating in states outside of California.

14      88.    Item 13 of the Policy's Certificate is entitled, "**Conformity to statute**," and

15  it provides that "[a]ny terms of this Certificate which may conflict with applicable statutes

16  (or statutes deemed applicable by a court of competent jurisdiction) are amended to

17  conform with the minimum requirements of such statutes."

18      **C.**    **The General Cover Declarations Page.**

19      89.    The second portion of the Policy is the "General Cover Declarations Page"

20  ("Declarations Page").

21      90.    Beazley issued an "all risk" commercial property policy, bearing policy

22  number W25A95200201 for the Policy Period of January 1, 2020 to January 1, 2021

23  ("Policy"), which was a renewal of policy number W25A95190101.

24      91.    The Policy names Spearmint Rhino Companies Worldwide, Inc. as the

25  Insured and includes a schedule of named insureds, including all of the other Plaintiffs in

26  this action.

27

28

**FIRST AMENDED COMPLAINT FOR DAMAGES**

92.     The Policy insures against the following perils: "Risks of Direct Physical Loss or Physical Damage excluding Flood and Earth Movement including Equipment Breakdown, except are herein after excluded within this Policy . . . ."

**D.     The Policy's Six (6) Different Sections – Sections A through F.**

93.     After the Declarations Page, the Policy includes six (6) different sections: SCHEDULE (Section A); GENERAL PROVISIONS (Section B); PROPERTY DAMAGE (Schedule C); TIME ELEMENT (Section D); LOSS ADJUSTMENT AND SETTLEMENT CONDITIONS (Section E); and OTHER (Section F).

*1.     Section A*

94.     In the SCHEDULE (Section A), the Policy provides that the "maximum limit of liability under this Policy for any one Occurrence shall not exceed **$10,000,000** . . . ."

*2.     Section B*

95.     In GENERAL PROVISIONS (Section B), under the term "**TERRITORY**," the Policy states that "[t]his Policy covers Insured Locations situated within the Territory specified in the Schedule."

96.     Under the term "**INSURED LOCATION**," the Policy states, *inter alia*, that: "[t]he coverages under this Policy apply to an Insured Location unless otherwise provided. Insured Location is a location listed in the Schedule and/or on a separate schedule on file with the Underwriters."

97.     The locations listed in the Schedule on file with the Underwriters, to wit: Beazley, include each of the twenty-three (23) clubs at issue in this action as well as the Spearmint Rhino Super Store retail location. Thus, all of Plaintiffs' clubs constitute Insured Property under the Policy.

**FIRST AMENDED COMPLAINT FOR DAMAGES**

98.     Section B of the Policy also contains a number of General Exclusions that Beazley asserts apply to and bar coverage for Plaintiffs' claims. Those exclusions include the following:

**GENERAL EXCLUSIONS**

A.     Unless specifically stated elsewhere in this Policy, this Policy excludes:

. . . .

2)     interruption of business;

3)     loss of market or loss of use;

6)     loss from enforcement of any law or ordinance:

    a)     regulating the construction, repair replacement, use or removal, including debris removal, of any property; and/or . . .

8)     loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with the actual or threatened malicious use of pathogenic or poisonous biological or chemical materials regardless of any other cause or event contributing concurrently or in any other sequence thereto.

. . . .

C.     This Policy excludes the following unless directly resulting from other direct physical loss or physical damage not excluded by this Policy:

1)     contamination including but not limited to the presence of pollution or hazardous material. . . .

D.     This Policy excludes any loss, damage, claim, cost, expense or other sum directly or indirectly arising out of or relating to:

    mold, mildew, fungus, spores or other microorganism of any type, nature, or description, including but not limited to any substance whose presence poses an actual or potential threat to human health.

    This Exclusion applies regardless whether there is (i) any physical loss or damage to Property Insured; (ii) any insured peril or cause, whether or not contributing concurrently or in any sequence; (iii) any loss of use, occupancy, or functionality; or (iv) any action required, including but not limited to repair, replacement, removal, cleanup, abatement, disposal, relocation, or steps taken to address medical or legal concerns.

28

### 3. Section C

99. Section C of the Policy is entitled "**PROPERTY DAMAGE**."

100. The **INSURING CLAUSE** under Section C provides: "In consideration of the payment of premium as specified in the Declarations, and subject to the terms, conditions and exclusions of this Policy, the Underwriters agree to cover the Property Insured against risks of direct physical loss or physical damage occurring during the Period of Insurance."

101. In Section C under the heading Property Insured, Beazley makes it clear that Property Insured includes the real property at an Insured Location. Specifically, Beazley states:

> This Policy insures the following property, unless otherwise excluded, located at an Insured Location or within one thousand (1,000) feet thereof, to the extent of the interest of the Insured in such property.

> A. Real Property at an Insured Location, in which the Insured has an insurable interest.

> B. Personal Property: . . .

### 4. Section D

102. Section D of Beazley's Policy is entitled "**TIME ELEMENT**:"

**TIME ELEMENT - SECTION D**

**LOSS INSURED**

> A. This Policy insures Time Element loss, as set forth in the Time Element Coverages, directly resulting from direct physical loss or physical damage insured by this Policy occurring during the Period of Insurance to Property Insured by this Policy.

> B. This Policy insures Time Element loss only to the extent it cannot be reduced through:

> 1) the use of any property or service owned or controlled by the Insured;

> 2) the use of any property or service obtainable from other sources;

29

3)    working extra time or overtime; or

4)    the use of inventory,

all whether at an Insured Location or at any other location. The Underwriters reserve the right to take into consideration the combined operating results of all associated, affiliated or subsidiary companies of the Insured in determining the Time Element loss.

C.    This Policy covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section of this Policy. The amount of such recoverable expenses will not exceed the amount by which the loss has been reduced.

D.    Except as respects Leasehold Interest, in determining the amount of loss payable, the Underwriters will consider the experience of the business before and after and the probable experience during the Period of Liability.

## TIME ELEMENT COVERAGE

### GROSS EARNINGS

1)    Measurement of Loss:

    a)    The recoverable Gross Earnings loss is the Actual Loss Sustained by the Insured of the following during the Period of Liability:

        (i)    Gross Earnings;

        (ii)    less all charges and expenses that do not necessarily continue during the interruption of production or suspension of business operations or services;

        (iii)    plus all other earnings derived from the operation of the business.

    b)    In determining the indemnity payable as the Actual Loss Sustained, the Underwriters will consider the continuation of only those normal charges and expenses (including up to thirty (30) days Ordinary Payroll) that would have been earned had no interruption of production or suspension of business operations or services occurred.

    c)    There is recovery hereunder but only to the extent that the Insured is:

        (i)    wholly or partially prevented from producing goods or continuing business operations or services;

30

        (ii)     unable to make up lost production within a reasonable period of time, not limited to the period during which production is interrupted;

        (iii)    unable to continue such operations or services during the Period of Liability; and

        (iv)    able to demonstrate a loss of sales for the operations, services or production prevented.

   2)    The following term(s) mean(s):

Gross Earnings, as used in item 1a)(i):

     a)    for manufacturing operations: the net sales value of production less the cost of all raw stock, materials and supplies used in such production; and

     b)    for mercantile or non-manufacturing operations: the total net sales less cost of merchandise sold, materials and supplies consumed in the operations or services rendered by the Insured.

        Any amount recovered under Property Damage coverage at selling price for loss or damage to merchandise will be considered to have been sold to the Insured's regular customers and will be credited against net sales.

Ordinary Payroll, as used in item 1b):

        the entire payroll expense for all employees of the insured except officers, executives, department managers and employees under contract.

Research and Development

        In respect of research and development activities, Gross Earnings includes the Actual Loss Sustained by the Insured of only continuing fixed charges and Ordinary Payroll directly attributable to the interruption of research and development activities that in themselves would not have produced income during the Period of Liability.

103.   The Policy also contains several **TIME ELEMENT EXCLUSIONS**, in particular A. 4., that Beazley asserts applies to and bars coverage for Plaintiffs' claims:

### TIME ELEMENT EXCLUSIONS

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to Time Element loss:

This Policy does not insure against:

31

A.  Any loss during any idle period, including but not limited to when production, operation, service or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:

1)  physical loss or damage not insured by this Policy on or off the Insured Location;
2)  planned or rescheduled shutdown;
3)  strikes or other work stoppage; and/or
4)  any other reason other than physical loss or damage insured by this Policy.

104.  As previously discussed herein the Covid-19 Governmental Orders depriving the Plaintiffs of their ability to conduct their business operations constitutes "direct physical loss," thereby rendering Exclusion A, and in particular A. 4. inapplicable by its express terms.

## VII.  BEAZLEY'S BASES FOR DENYING COVERAGE ARE INCORRECT.

### A.  General Principles of Contract Interpretation under California Law.

105.  Under California law, insurance policies are contracts. Therefore, they are governed by the rules of construction applicable to contracts. (*Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal.4th 645, 666 (1995)).

106.  The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties. (*Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1264 (1992)). Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807, 821-822 (1991)). The "clear and explicit" meaning of the provisions interpreted in their "ordinary and popular sense" controls judicial interpretation. (*Id.*)

107.  Where a policy does not define a particular term, a court must presume that the words have their plain, ordinary meanings. (*See Montrose, supra*, 10 Cal.4th at 666). The plain, ordinary meaning of an undefined term may be ascertained by referring to a dictionary. (*Jordan v. Allstate Ins. Co.*, 116 Cal.App.4th 1206, 1216 (2004)).

108.  A policy is to be interpreted in its entirety with each provision interpreted in the context of all the other policy provisions, so that each provision gives meaning to the

32

other parts. (*Holz Rubber Co. v. American Star Ins. Co.*, 14 Cal.3d 45, 56 (1975); *People ex rel. Dept. of Parks & Recreation v. West-A-Rama, Inc.*, 35 Cal.App.3d 786, 793 (1973)). A policy is also interpreted in light of the factual context presented. (*Pulte Home Corp. v. American Safety Indem. Co.*, 14 Cal.App.5th 1086, 1104 (2017) (citation omitted). Policy language in one context can have a clear and unambiguous meaning, yet in a different context have an unclear ambiguous. (*E.M.M.I., Inc. v. Zurich American Ins. Co.*, 32 Cal.4th 465, 470 (2004) (citation omitted).

      **B.**    **The Policy's Time Element Loss is Triggered – The Plain Meaning of "Direct Physical Loss" Includes the Physical Deprivation and Loss of Possession of the Insured's Real Property.**

    109.   As noted above, the relevant coverage provision in the Policy is entitled "TIME ELEMENT – SECTION D." Paragraph A of this Section is the "insuring agreement" for this coverage, which provides that "[t]his Policy insures Time Element loss, as set forth in the Time Element Coverages, directly resulting from direct physical loss or physical damage insured by this Policy occurring during the Period of Insurance to Property Insured by this Policy."

    110.   Some of the terms used in the "Time Element" insuring agreement are defined in other parts of the Policy. For example, "Property Insured" refers to the different real property identified in the schedule of locations provided to the Underwriters, to wit, Beazley. It also includes personal property at those locations. Accordingly, as the term "direct physical loss" is used in the Time Element coverage provided by the Policy, it applies both to an Insured's real property in addition to any personal property located within the real property location.

    111.   The language used in the Gross Earning's section of the Policy's Time Element coverage reflects that this coverage applies to situations where an insured is prevented, in whole or in part, from continuing its business operations or services. Thus, from a contextual analysis of these related provisions, it becomes apparent that the Policy's

Time Element coverage includes direct physical loss occurring at an insured location that prevents the insured from conducting its business operations or services.

112. A number of the terms used in the Time Element "insuring clause" are not defined in the Policy.

113. The term "direct" means "without interruption or diversion" and "without any intervening agency or step." (*In re Furnace*, 185 Cal.App.4th 649, 661 (2010) (quoting Webster's Third New International Dictionary 640 (1986)).

114. "Physical" is defined as "[o]f pertaining to material nature . . . ." (*Blasiar, Inc. v. Fireman's Fund Ins. Co.*, 76 Cal.App.4th 748, 754 (1999) (quoting 3 Oxford English Dictionary 346-347 (1933)).

115. "Loss" has been defined as "the act of losing possession." (*AB Recu Finans v. Nordstern Ins. Co. of N. Am.*, 130 F.Supp.2d 596, 600 (S.D.N.Y. 2001) (quoting Webster's New Collegiate Dictionary 706 (1985)); *see also* Dictionary.com ("'Loss' is also defined as detriment, disadvantage, or deprivation from failure to keep, have, or get"). Deprivation, in turn, means "being kept from possessing, enjoying, or using something." (Merriam-Webster.com, last accessed August 17, 2020).

116. The term "damage" is defined as "[p]hysical harm that impairs the value, usefulness, or normal function of something." (*HBE Corp. v. K.S. Mech., Inc.*, 2018 WL 6113099, at *10 (C.D. Cal. Feb. 23, 2018) (quoting Oxford English Dictionary (2013)).

117. The term "or" is a disjunctive particle used to express an alternative or to give a choice of one among two or more things. (*Housing Authority of County of Kings v. Peden*, 212 Cal.App.2d 276, 278-279 (1963) (citation omitted)).

118. After incorporating these definitions and other relevant policy provisions, as well as applying California's general contract interpretation principles, the following conclusions are reasonably drawn regarding the Time Element coverage provision:

a. The Policy's Time Element coverage is provided on an "all risk" basis.

34

Thus, "all risks are covered [under the Policy's Time Element coverage] unless specifically excluded in the policy." *Davis v. United Servs. Auto. Assn.,* 223 Cal.App.3d 1322, 1328 (1990).

b.      The Policy does not contain any exclusion that applies to orders, such as the Covid-19 Governmental Order issued by states, such as California and other states or other government (i.e., public) authorities that prevent the Plaintiffs from continuing their business operations because of public health and safety issues. Accordingly, the Shut Down Orders constitute a covered risk.

c.      Plaintiffs' Time Element losses here directly result from the Covid-19 Governmental Orders at issue here. Put another way, Plaintiffs seek only losses within the Time Element Coverage which are in the millions directly resulting from such orders.

d.      The phrase "physical loss" has a meaning distinct from the phrase "physical damage." *ACL Tech., Inc. v. Northbrook Prop. & Cas. Ins. Co.*, 17 Cal.App.4th 1773, 1786 (1993) (court must give effect to all contract provisions so as not to render any of them meaningless). Here, the phrase "physical loss" must be given a separate and distinct meaning to that of "physical damage." Any assertion by Beazley that "physical loss" is synonymous with "physical damage" is therefore an unreasonable interpretation that violates California's rules of contract interpretation.

e.      As reflected by words used in the Policy, "physical loss" triggering the Policy's Time Element coverage can exist without any "physical damage" occurring; otherwise, there would be no need for Policy to include the term "physical loss." If Beazley were to assert that "physical damage" was the only way to trigger Time Element coverage for real property identified as an insured location, the Policy would have to be rewritten. This is not something a Court applying California law can do. (*Rosen v. State Farm General Ins. Co.*, 30 Cal.4th 1070, 1077 (2003)).

**FIRST AMENDED COMPLAINT FOR DAMAGES**

119.     Here, the "Time Element" coverage promised by the Policy broadly applies to situations where Plaintiffs are deprived or prevented from performing their business operations within the physical confines of their insured properties. This includes situations where 'direct physical loss' has occurred such as when they cannot access or use their property to conduct business operations because of a government order – a covered cause of loss – preventing them from doing so. "The plain meaning of 'direct physical loss' encompasses physical displacement or loss of physical possession. That the loss must be 'physical' distinguishes the loss from some other, incorporeal loss." *Universal Sav. Bank, supra,* 2004 WL 3016644, at *6.

120.     The phrase "direct physical loss", when analyzed here in the context of the other policy provisions and underlying factual situation, is reasonably interpreted as applying to the subject orders preventing the clubs from conducting their business operations.

121.     Taken together, the Policy provides Time Element coverage here because Plaintiffs' loss directly results from the Covid-19 Governmental Orders, and such orders by operation of law prohibit (*i.e.,* prevent) Plaintiffs from using the physical premises of their insured locations for purposes of conducting their business operations. This interpretation is one that is consistent with California's rules of contract interpretation.

122.     Moreover, even if Beazley is ultimately able to suggest an alternative interpretation of this provision that a Court deems to be reasonable, this would only create an ambiguity (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.*, 5 Cal.4th 854, 867 (1993)), which the Court would very likely construe against Beazley. (*Pardee Constr. Co., supra,* 77 Cal.App.4th at 1352).

**FIRST AMENDED COMPLAINT FOR DAMAGES**

**C.**   **None of the Policy Exclusions That Beazley Relies Upon Apply to Plaintiffs' Time Element Losses.**

123.   Finally, none of the exclusions cited by Beazley applies under the circumstances presented here.

124.   Beazley, in its denial letter, asserted that General Exclusion A. 2, A. 3, and A. 6 applied to and barred coverage to the Plaintiffs' claims for coverage. (Exhibit B at p. 6). Beazley admits in its denial letter, however, that these exclusions do ***not*** apply if the Time Element coverage provided by the Policy is triggered because, in such circumstances, there is physical loss or physical damage to property. Specifically, Beazley in interpreting A. 2, A. 3, and A. 6 asserted:

> Any claim that would potentially fall within the scope of exclusions A. 2, 3 and 6 would be excluded ***unless otherwise covered by the Time Element coverage afforded by the policy***. But as stated above, there is no evidence or indication that the insured's claim falls within the insuring agreement of such coverage, and these exclusions reinforce the assertion that physical loss of or physical damage to property is required. Absent evidence that the insured's property or neighboring properties have suffered any physical damage, there is no coverage for the insured's loss of use of the premises," whether due to the government mandated business closures or otherwise." (***Emphasis*** added) (Exhibit B at p. 6).

The closure of the insured premises necessitated by the Covid-19 Governmental Orders, however, as discussed hereinabove, constitutes "direct physical loss" of those insured locations (*supra,* at ¶¶ 8-14 & 108-120). Pursuant to Beazley's own interpretation, General Exclusions A. 2, A. 3, and A. 6, therefore, do not apply to Plaintiffs' claims for coverage presented herein.

125.   Additionally, General Exclusions A. 2, A. 3, and A. 6 also do not apply because the language of these exclusions, by their terms, do not apply and/or are ambiguous. Specifically,

(a)   General Exclusion A. 2 is inapplicable here. Plaintiffs seek Time Element coverage, not business interruption coverage. Moreover, the undefined phrase "Interruption of Business" is also ambiguous, as it would take an attorney or insurance expert to

1   understand its meaning. *Dominguez v. Financial Indem. Co.*, 183 Cal.App.4th 388, 396

2   (2010) (citation omitted).

3       (b)    Beazley's reliance on General Exclusion A. 3 is also unavailing. A provision

4   for "loss of market or loss of use" excludes coverage for consequential damages." Here,

5   Plaintiffs are seeking to recover Time Element loss under the Policy, not consequential

6   damages caused by Beazley's breach of the insurance contract. (*Cf. Pacific Coast*

7   *Engineering Co. v. St. Paul Fire & Marine Ins. Co.*, 9 Cal.App.3d 270, 275 (1970) ("[T]he

8   business interruption insurance issued herein provides coverage only for losses resulting

9   directly from interruption of the business, i.e., operation of the plan, and not merely from

10   interruption of the work being done on the construction of a particular product at the time

11   of the occurrence of a peril insured against.")).

12       (c)    Beazley's reliance on General Exclusion A. 6 is also without merit. This

13   exclusion applies to "loss from enforcement of any law or ordinance: a) regulating the

14   construction, repair, replacement, use or removal, including debris removal, of any

15   property; and/or b) requiring the demolition of any property, including the cost in

16   removing its debris." The Covid-19 Government Shutdown Orders do not qualify as a "law

17   or ordinance" rendering Exclusion A. 6 inapplicable by its terms. Even if the subject

18   Covid-19 Government Shutdown Orders were interpreted as constituting a "law or

19   ordinance," the exclusion by its express terms applies only to a "law or ordinance" that

20   regulates construction, repair, replacement, removal and debris removal, none of which are

21   at issue here. And while this exclusion also includes the term "use" in the phrase "use or

22   removal", under the principle of *ejusdem generis*, this term must be construed as having a

23   similar nature to the other listed terms. (*Pfeiffer v. Countrywide Home Loans, Inc.*, 211

24   Cal.App.4th 1250, 1275 (2012) (citations omitted)). Thus, the term "use" as used in

25   Exclusion A. 6 applies to law or ordinances involving, *inter alia*, matters involving

26

27

28

**FIRST AMENDED COMPLAINT FOR DAMAGES**

construction, repair and debris removal. It does not apply to the public health and safety Covid-19 Governmental Orders at issue.

126.   Beazley's General Exclusion A. 8 is also inapplicable here for a variety of reasons. Most obviously, Exclusion A. 8, by its express terms, applies *only* to the "malicious use" of pathogens or poisons. The subject Covid-19 Governmental Orders, however, do not in any way involve the "malicious use" of pathogens or poisons. Additionally, the Covid-19 Governmental Orders are not predicated upon the presence of the pathogens or poisons (let alone the malicious use thereof) at any of the clubs; rather, these health and safety orders were issued to **prevent** the introduction of Covid-19 in the first place within non-essential businesses, and relatedly, to keep humans from being in close proximity to one another so as to prevent its transmission. The enforcement of these Covid-19 Governmental Orders did not require, let alone involve, the "use" of pathogens or poisons whether or not "malicious." Finally, large portions of the language used in General Exclusion A. 8 – such as "indirectly" and "regardless of any other cause or event contributing concurrently or in any other sequence thereto" – are unenforceable as a matter of public policy under California law. (*Julian, supra,* 35 Cal.4th at 754-55 (citing, *inter alia*, *Howell, supra*, 218 Cal.App.3d at 1452; *Garvey, supra,* 48 Cal.3d at 399).

127.   Turning to Beazley's General Exclusion C, the "Contamination" Exclusion provides, in pertinent part, that "[t]his Policy excludes the following **unless** directly resulting from other direct physical loss or physical damage not excluded by this Policy: 1) **contamination** including but not limited to the presence of **pollution** or **hazardous** material." (**Emphasis** added). Beazley's "Contamination" Exclusion, as is the case with the other exclusions upon which it relies, does not apply for multiple reasons.

(a)   *First*, the Contamination Exclusion expressly applies only to a situation where there has been contamination. Here Plaintiffs' clubs were closed without any finding

**FIRST AMENDED COMPLAINT FOR DAMAGES**

1  that any of them were, in fact, "contaminated" with Covid-19. Exclusion C, under the facts
2  applicable here, therefore does not apply.

3  (b)  *Second*, the Contamination Exclusion, by its terms, applies only to situations
4  where a covered peril under the Policy did not cause the "contamination." Exclusion C
5  applies "unless directly resulting from other direct physical loss . . . not excluded by the
6  Policy." As discussed *supra*, the Covid-19 Governmental Orders constitute "direct physical
7  loss" that is not excluded. Accordingly, even if contamination is present (which it is not),
8  by its terms the Contamination Exclusion does not apply.

9  (c)  *Third*, the language of the Contamination Exclusion, which states it applies
10  when pollution or hazardous materials are present, makes it a form of a "pollution"
11  exclusion. However, under California law, pollution exclusions apply only to situations
12  commonly thought of as environmental pollution. (*MacKinnon v. Truck Ins. Exchange*, 31
13  Cal.4th 635, 639 (2003) (holding that pollution exclusion did not apply to situation where
14  insured used pesticides to remove bee infestation which allegedly killed someone). Here,
15  even if Covid-19 were ultimately found to have contaminated an insured location the
16  Contamination Exclusion does not apply since any "contamination" that might be present
17  at a given location is not the result of "environmental pollution."

18  128.  Exclusion D, Beazley's "Mold Exclusion" by its express terms, applies to
19  "any loss . . . directly or indirectly arising out of or relating to: mold, mildew, fungus,
20  spores or other microorganism of any type, nature or description, including but not limited
21  to any substance whose presence poses an actual or potential threat to human health." For a
22  number of reasons articulated below, the "Mold Exclusion" does not apply to the Covid-19
23  Governmental Orders.

24  (a)  *First,* the "Mold Exclusion," by its terms and the application of California's
25  rules of contract interpretation, applies only to items falling within the "fungus kingdom"
26  of living things. The words Beazley uses in its "Mold Exclusion" start by enumerating four

27
28

**FIRST AMENDED COMPLAINT FOR DAMAGES**

(4) specific items as being within its scope. Those four (4) specific items are ". . . mold, mildew, fungus, [and] spores . . .", all of which refer to the "fungus kingdom" of living things. For example, the plain meaning of "fungus" refers to ": any of a kingdom (Fungi) of saprophytic and parasitic *spore-producing* eukaryotic typically filamentous organisms formerly classified as plants that lack chlorophyll and include *molds*, rusts, *mildews*, smuts, mushrooms, and yeasts." (Merriam-Webster, online dictionary, last accessed August 15, 2020). The "Mold Exclusion," after listing the four specific fungus kingdom items ("mold, mildew, fungus, spores") then contains language referring to "or other microorganism of any type, nature or description, including but not limited to any substance whose presence poses an actual or potential threat to human health." The "or other microorganism of any type, nature or description . . ." language, under California law, is interpreted as being of the same general kind or type as the specifically enumerated preceding items, to wit: microorganism falling within the "fungus" family of microorganism. (*See, e.g.*, *Ortega Rock Quarry v. Golden Eagle Ins. Co.*, 141 Cal.App.4th 969, 981 (2006) (citing Cal. Civ. Code § 3534)). Accordingly, the "Mold Exclusion" is reasonably interpreted as applying only to microorganisms falling within the "fungus kingdom," which a virus – such as the Covid-19 virus – is not part of.

(b)    *Second*, the plain everyday meaning of "virus" does not fall within the plain everyday meaning of the word "microorganism" as used in the Mold Exclusion, even if one inappropriately gives the word an expansive interpretation beyond its reference to the preceding enumerated items, all of which are within the "fungus kingdom" of living things. Specifically, if the enumerated items in the Mold Exclusion are simply considered to be living things (as opposed to being within the "fungus kingdom"), the plain meaning of the word "microorganism" simply refers to microscopic living things. (*See, e.g.*, Cambridge Dictionary (defining microorganism as "living thing that on its own is too small to be seen without a microscope").) A virus such as Covid-19, by contrast, is not a living organism.

**FIRST AMENDED COMPLAINT FOR DAMAGES**

1   (*See* Dictionary.com ("Viruses are not technically considered living organisms because
2   they are devoid of biological processes (such as metabolism and respiration) and cannot
3   reproduce on their own but require a living cell (of a plan, animal, or bacterium) to make
4   more viruses)."). Since the plain everyday meaning a layperson would give the word
5   "microorganism" does not include "viruses" – which are not living things – the Mold
6   Exclusion also does not apply for this reason. Moreover, under the rule of *ejusdem generis*,
7   the Mold Exclusion's "catch-all" phrase of "including but not limited to" must be
8   construed as having the same general nature as the enumerated (i.e., living) items. (Cal.
9   Civ. Code § 3534; *Furtado v. Metropolitan Life Ins. Co.*, 60 Cal.App.3d 17, 25 (1976)).

10          (c)     *Third,* the Mold Exclusion is also uncertain and ambiguous to the extent it
11   requires that an insured needs scientific expertise to interpret the exclusion. (*See, e.g.*,
12   *Armstrong World Industries, Inc., supra,* 45 Cal.App.4th at 36 ("A policy should not be
13   read as it might be analyzed by an attorney or an insurance expert. This is so even if the
14   policyholder is a sophisticated insured.") (citations omitted); *AIU Ins. Co., supra,* 51
15   Cal.3d 807 (1990) (unreasonable to conclude that phrase "legally obligated to pay"
16   unambiguously incorporated sophisticated legal distinction; thus, the court resolved the
17   ambiguity in favor of coverage; *Ponder v. Blue Cross of Southern California*, 145
18   Cal.App.3d 709, 724 (1983) ("On its face, the clause excluding coverage for
19   *temporomandibular joint syndrome* scarcely appears 'comprehensible to lay persons.' It is
20   a technical medical term which has meaning primarily for health professionals.")).

21          (d)     *Fourth*, for the Mold Exclusion to apply here, giving the words their plain
22   everyday meaning in context, Beazley effectively is asking a court to rewrite the Mold
23   Exclusion so that the exclusion includes the concept of viruses. Such an interpretation,
24   however, would require the court to rewrite the Mold Exclusion by either: (i) adding the
25   word "virus" to the specific list of enumerated items so that it reads "mold, mildew,
26   fungus, spores, *[viruses]* or microorganisms of any type . . ."; or (ii) specially defining

27

28
                                                42
          **FIRST AMENDED COMPLAINT FOR DAMAGES**

1 │ microorganism to include, *inter alia*, "viruses." Beazley's interpretation, however, under

2 │ California's rules of contract interpretation, is an unreasonable one to the extent it would

3 │ require a court to re-write the exclusion – something it cannot do – in order to interpret the

4 │ policy in the manner it desires. (*Rosen, supra,* 30 Cal.4th at 1077. Moreover, Beazley is a

5 │ very sophisticated entity and could have easily written an exclusion clearly and

6 │ unequivocally, as they did in connection with the issuance of other policy forms, excluding

7 │ viruses (*See, e.g., SA Palm Beach LLC v. Certain Underwriters at Lloyds London*, Case

8 │ No. 9:20-cv-80677-UU, Dkt. No. 20 at p. 20 (S.D. Fla. June 29, 2020) (the policy contains

9 │ exclusion for "mold, fungus, bacteria, or virus").

10 │ (e)    *Fifth,* under California law, certain aspects of the Mold Exclusion providing

11 │ it applies "directly or indirectly arising out of or relating to" to the excluded risk are void

12 │ and unenforceable – as a matter of public policy – under California law. (*Julian, supra,* 35

13 │ Cal.4th at 754-55 (citing, *inter alia*, *Howell, supra,* 218 Cal.App.3d at 1452; *Garvey,*

14 │ *supra,* 48 Cal.3d at 399).

15 │ (f)    *Sixth,* as discussed above, any interpretation by Beazley of the Mold

16 │ Exclusion asserting it applies to a "virus" are contrary to various California rules of

17 │ contract interpretation and therefore as a matter of California law are unreasonable and

18 │ cannot be adopted and applied by a California court. (*La Jolla Beach & Tennis Club, Inc.*

19 │ *v. Industrial Indem. Co.*, 9 Cal.4th 27, 37 (1994). The "Mold Exclusion therefore would

20 │ not in such circumstances apply.

21 │ (g)    *Seventh,* the Plaintiffs' interpretation of the Mold Exclusion that it does not

22 │ apply to viruses is consistent with California's rules of contract and therefore is a

23 │ reasonable interpretation of the exclusion. Even if a court were to determine that Beazley's

24 │ interpretation that the Mold Exclusion applies to "viruses" is a reasonable one, it only

25 │ creates a situation where multiple reasonable interpretations, one favorable to coverage and

26 │ one favorable to no-coverage exists. Such a situation creates an ambiguity under California

27 │

28 │

**FIRST AMENDED COMPLAINT FOR DAMAGES**

1  law. (*Pardee Constr. Co., supra,* 77 Cal.App.4th at 1352). This kind of ambiguity, along

2  with the other ambiguities that apply to the Mold Exclusion such as the need to have

3  scientific expertise to interpret it – irrespective of the rule that uncertain or ambiguous

4  exclusions are interpreted narrowly and against the insurer who drafted the language.

5  (*MacKinnon, supra*, 31 Cal.4th at 648 (citation omitted)).

6      (h)    *Finally*, even if Plaintiffs' claim falls within the scope of the enforceable

7  portions of the Mold Exclusion because it is unambiguously determined to apply to a virus

8  (and it does not), the government shutdown orders – which are a covered risk of loss under

9  the Policy – and not the Covid-19 virus, is the "efficient proximately cause" (i.e., the

10  "predominating" or "most important cause") of Plaintiffs' loss. As such, Plaintiffs' Time

11  Element loss is covered irrespective of the Mold Exclusion being a contributing cause to

12  the loss. (*Von Der Lieth*, *supra*, 54 Cal.3d at 1131-33).

13      129.   Beazley's reliance on Time Element Exclusion A.4., which applies only to

14  Time Element coverage, as is the case with all the other exclusions upon which they rely,

15  is misplaced.

16      (a)    This exclusion provides, in pertinent part, that the Policy does not insure

17  against "[a]ny loss during any idle period, including but not limited to when production,

18  operation, services or delivery or receipt of goods would cease or have not taken place or

19  would have been prevented due to: . . . 4) any other reason other than ***physical loss or***

20  ***damage*** insured by this Policy." (***Emphasis*** added). Effectively, Time Element Exclusion

21  A.4. provides that there is no Time Element coverage if the insureds ceased or were

22  prevented from operating because of some reason other than "physical loss or damage," the

23  equivalent of the "physical loss or physical damage" requirement found in the Time

24  Element coverage Insuring Agreement, Paragraph A.

25      (b)    Here, as expressed previously in this complaint (*see supra*, at ¶¶ 8-14 &

26  108-120), the reason Plaintiffs' clubs ceased operating was the "direct physical loss" they

27

28

**FIRST AMENDED COMPLAINT FOR DAMAGES**

sustained due to the Government Shutdown Orders that prohibited, *i.e.,* necessitated, that they cease operating their businesses out of the physical confines of the insured locations covered by the Policy. This is further exemplified by the fact that in those jurisdictions where governmental shut down orders were lifted, the clubs in those jurisdictions reopened and started once again conducting their business operations. Here, Plaintiffs' losses are covered under the Time Element coverage provisions, as the closure of their operations was due to "direct physical loss" thereby rendering Time Element Exclusion A. 4. inapplicable.

130.   Finally, Beazley is a sophisticated entity. It has long known of the existence of viruses, epidemics, and pandemics. It has also long known of the existence of state and local health and safety law orders regulating whether, when, and how businesses can operate during epidemics or pandemics. Despite this knowledge, Beazley failed to exclude coverage for such risks under its Policy. Beazley should be required to honor the contractual bargain they entered with Plaintiffs and pay the Plaintiffs the Time Element loss they sustained directly resulting from the direct physical loss they sustained here, up to the Policy's $10 million per occurrence aggregate limits of liability.

## **FIRST CAUSE OF ACTION**

(Breach of Contract against Beazley)

131.   Plaintiffs incorporate by reference each allegation contained in paragraphs 1 through 130, above.

132.   Plaintiffs tendered their claim for Time Element losses arising from the above-referenced Covid-19 Governmental Orders.

133.   The Policy obligates Beazley to pay Plaintiffs for the Time Element losses they have claim directly resulting from the Covid-19 Governmental Orders.

134.   Beazley has refused to pay Plaintiffs for any, let alone all, of the Time Element losses to which Plaintiffs are entitled to under the Policy.

**FIRST AMENDED COMPLAINT FOR DAMAGES**

135.   By refusing to pay Plaintiffs the $10 million in Time Element losses per occurrence caused by the Covid-19 Governmental Orders, Beazley has breached the Policy.

136.   All conditions and requirements imposed by the Policy on Plaintiffs, including but not limited to payment of premiums, timely notice of claim, and exhaustion of deductibles, if any, have been satisfied and/or waived and/or subject to an estoppel or other avoidance against Beazley.

137.   As a direct and proximate result of Beazley's conduct, Plaintiffs have been deprived of the benefit of the Policy for which premiums were paid, and have sustained substantial damages in a sum to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

### **ON THE FIRST CAUSE OF ACTION**

1.   For actual and compensatory damages in an amount to be determined at the time of trial.

2.   For prejudgment and post-judgment interest;

3.   For costs of suit incurred herein; and

4.   For such further relief as the Court deems just and proper.

Dated:  September 16, 2020          FORTIS LLP


                                   By:  /s/ *Stanley H. Shure*
                                   Attorneys for Plaintiffs
                                   RIALTO POCKETS, INC., ET AL.

**FIRST AMENDED COMPLAINT FOR DAMAGES**

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs Rialto Pockets, Inc.; Brookhurst Venture, LLC; City of Industry Hospitality Venture, Inc.; Farmdale Hospitality Services, Inc.; High Expectations Hospitality, LLC; Inland Restaurant Venture I, Inc.; Kentucky Hospitality Venture, LLC; K-Kel, Inc.; L.C.M., LLC; Midnight Sun Enterprises, Inc.; Nitelife, Inc.; Olympic Avenue Venture, Inc.; The Oxnard Hospitality Services, Inc.; Penn Ave Hospitality, LLC; Platinum SJ Enterprise; PNM Enterprises, Inc.; Rouge Gentlemen's Club, Inc.; Santa Barbara Hospitality Services, Inc.; Santa Maria Restaurant Enterprises, Inc.; Sarie's Lounge, LLC; The Spearmint Rhino Adult Superstore, Inc.; World Class Venues, LLC; Washington Management, LLC; and W.P.B. Hospitality, LLC hereby demand a trial by jury on all claims.

Dated:  September 16, 2020

FORTIS LLP

By:   /s/ *Stanley H. Shure*
Attorneys for Plaintiffs
RIALTO POCKETS, INC., ET AL.

1